The next argued case this morning, December 14, 1775, In Re Interval Licensing, LLC, Mr. Davis. Your Honor. Good morning. May it please the Court. I'll start with the Joaquim rejection because it was the primary reference that was relied upon the Board and also the reference that covers the most of the claims, including the original claims and the dependent claims. Additionally... I just want to say that all of this technology is very cool. I want some of this at home. Thank you. Additionally, with respect to Joaquim, if the Court agrees that there is an error in the claim construction, it will necessarily require a remand because the only other ground adopted based on Chenet and Bender did not cover all of the claims that were rejected. So, with respect to Joaquim, every claim requires that the display of a portion or representation of a second segment is generated in response to the display of a related first segment. In the American Calcar case, this Court addressed the term in response to, which is critical here, and it recognized that it has a plain and ordinary meaning, and that plain and ordinary meaning requires a cause and effect relationship or reaction. Isn't it true that every time we come through a claim term, other than perhaps the ones that fall within a certain category of defined terms, that if we're interpreting a phrase in a particular patent, it's in the context of that particular written description? Of course, Your Honor. And in the American Calcar case, the starting point for the analysis was plain and ordinary meaning, which required the reaction, the response of display. And that case went on to note that the specification didn't disclose any embodiments that would be excluded by that interpretation of in response to, and the same is the case here. Now, American Calcar, of course, did also address the prosecution history, but that was only in the context of evaluating a prosecution history estoppel argument under the doctrine of equivalence. So the beginning of the American Calcar analysis was the plain and ordinary meaning, which is what we're asking for to be applied in the present case to the use of the same terms. And in fact, the issue and the dispute is very similar between here and American Calcar. In both cases, the question is whether a display that is only generated if the user has to interact with a menu and select a button is nevertheless occurring in response to a prior event that is not the user selection of the button. But American Calcar did then go in and examine the specification or the written description to determine whether the plain and ordinary meaning is consistent with that. So what in the specification do you believe requires this automatic response? So we've identified a number of citations in our brief, in our opening brief, starting at page 25. The specification talks about the automatic display. It also talks about the display of the portion of representation, the second segment, changing when the display of the first segment changes. So both of those, the concept of an automatic display and a responsive changing as the display of the first segment changes, both suggest that the ordinary meaning is how the term is being used. It's referring to an automatic responsive display rather than something that is only triggered by an intervening user action. What do you make of claim 21, though? Does that not, because claim 21 says it's got to occur substantially coextensive in time. Are you saying that automatic could take, you know, 45 minutes? Well, I think if it's substantially coextensive in time, I think is, that could be referring to one of two things. It could be referring to the fact that the two are displayed overlapping. So at the same time, as time progresses. So, for example, if the first segment is being displayed for five minutes, for four minutes and 59 seconds of that, it's also being displayed on the second, the portion of representation of the second segment is also being displayed. What in the specification indicates that? I don't know that that particular concept is spelled out in the specification. I suppose figures 1 and 2A and 2B, which are showing a user, a graphic user interface on a separate device while a first device is showing the display of the primary segment, which shows you have two separate displays. While you're watching the first screen, the second screen automatically responds with substantially coextensive in time display of the portion of representation of the second segment on the second display device. And so the patent office... But it seems like you're just speculating about what that might mean. I guess I'm trying to understand, I mean, if you don't have claim differentiation problems here. I don't see a claim differentiation issue because you could have a possibility where the portion of representation of the second segment would display for longer than the display of the first segment. And so you could have an opportunity where the first segment changes and the portion of representation of the second segment would not necessarily change with it in that instance or for a portion of the graphic user interface. One of the regions, because as we explained in our brief, what's shown in figure 2A and 2B is a collection of portions or representations of second segments. And the claim recites one operates in a specific way. So you could have a case where not every single one of the portions or representations is changing automatically in response to the display of the first segment. And that also falls in with the patent office's argument about the possibility that certain portions or representations might be triggered by the toggling of a menu button to a portion of paragraph 14 about that issue. And the fact that the patent describes different ways of doing it doesn't change the ordinary meaning of in response to, which is consistent with how the term is used throughout the remainder of the patent. It's not the case that every possible implementation must be covered by every independent claim. If we conclude that in response to could be satisfied where some user intervention is allowed, then that answers the question with respect to the board's determination as to Joaquin, right? That is correct. So you have to prevail on this claim construction argument, right? Well, there are two dependent claims that were not covered by a Joaquin-based rejection. Right, I understand. But as the Joaquin, you would have to prevail on claim construction. That's correct, Your Honor. Okay. Would you comment on the treatment by the office of claims that you had not placed at issue? Claims that we had not placed at issue? Well, you said that the patent office focused on claim 174 in its argument, for instance, which was not at issue. Yes, so I can explain what happened with the dependent claims that are being relied upon for claim differentiation. Those claims were added in the very early stages of the reexamination. I think it was in the first office action. Oh, okay, so they were not original claims. They were not original claims. Okay. They're claims that were added to respond to the patent offices. I'm sorry, the examiners brought us reasonable interpretations in response to. And so when the examiner said it doesn't need to be automatically in response to, there could be user interact, intervening user actions, Intervolt proposed these dependent claims that incorporated what Intervolt believed was the correct construction. So what's the status of those claims now? Those claims were also all rejected by the examiner based on the Joaquim reference. But did you make any independent argument as it relates to those claims? So how those claims were handled, Your Honor, is because they contain expressly the construction that Intervolt believed was already present in all of the independent claims, they were effectively covered by the exact same arguments that were presented with respect to claim 20. So in its briefing, when Intervolt addressed the later claims, it referred back to its claim 20 argument because they were exactly the same. And under Intervolt's understanding and interpretation of claims, particularly for claim 157, which is where the automatically in response to language was added and that was the only additional limitation, there was really nothing else to say. The argument was fully articulated with respect to independent claim 20. And Intervolt has always made it completely clear that its interpretation and application of independent claim 20 and its view of the broadest reasonable construction of claim 20 requires automatic generation. So there's no ambiguity or confusion in the reexamination history about why those claims were added and that Intervolt believes that they were, in the case of 157, and I think there's a counterpart to claim 63, that it was Intervolt's view and position that they had the same scope as claim 20. Why not make 157 an independent claim? I'm not sure as a practical matter that would have solved how the Patent Office is approaching the claim differentiation argument because they still would have differed only by one limitation. And I can explain as a matter of, it really goes back to intervening rights and the fact that this is a patent that was involved in litigation. And so because of intervening rights, there's an incentive not to amend your claims if possible. But the broadest reasonable construction rule creates the situation where you might be disputing a construction, the patent team might want to explore patentability of a claim that incorporates what it believes is the correct construction. So adding a dependent claim that only adds that limitation is a straightforward and practical way to obtain the examiner's views about patentability under what the examiner believes is the correct construction and then with understanding of how the examiner will treat that claim can make a decision as to whether or not to amend to bring that limitation to the original independent claim. So unless your honors have any further questions on Joaquin, I'll move briefly to Sinead. The Sinead rejection was based on an assumption about how the reference worked that's not substantiated by the reference itself. The articulated motivation to combine is that it would be obvious to take the Sinead reference and use the Bender segment-to-segment comparison technique in order to identify matching photos and sound recordings. The reference does not show in Sinead that photos and sound recordings have signatures or that they are the subject of any segment-to-segment comparisons. Our best understanding of the reference is that it simply says that when articles come in, they may include photos and sound recordings with them. When the article is displayed, any photos or sound recordings that were part of the package when it came in will be pulled up and displayed as well. So once one sets aside the unsupported assumption that Sinead is doing photo and audio comparisons to articles on a segment-to-segment basis, there remains no motivation or no reason to adopt the Bender comparison technique. There's no use for it. Sinead operates on a categorization level where everything is bound through navigation of categories. So with that, I'll reserve the remainder of my time for rebuttal. Thank you, Mr. Davis. May it please the Court. Going back to Joaquim, I wanted to start by talking about the embodiments in the specification that are clearly not automatic, where the second display is displayed in response to the first display but requiring the click of a button by the user. So a couple of examples in the specification. One is at column 3, lines 26 to 30 or so, it says that it can be immediately identified and either displayed or identified as pertinent to the subject matter category and available for display. And then at column 10, it talks about line 56 to 61. It says the secondary information can be displayed, e.g. by the control device 101 or by the primary display device 102, in addition to the primary information, or not, i.e. the secondary information may be used only for categorizing and or manipulation of the primary information. This shows also that Interval tries to distinguish between the graphical user interface device and the display device, but this quote actually shows that the display device can also be turned on or off and can be turned on through user interaction.  It seems that even in those non-automatic portions, that there is an automatic response element to them. I think that's not true. So the part I just read shows that both devices, both the graphical user interface and the display device, can be turned on or off. And then one more quote shows, so at column 14, lines 49 through 51, it says, for example, a GUI, a GUI according to the invention, could function adequately without a related primary information region. And then further down, it talks about how, at line 60, it says, for example, a GUI, according to the invention, could be implemented such that a display of the related secondary information region 204 is produced only upon appropriate interaction with one or more menus and or dialog boxes. So it's covering all of the different types of information, the primary information, the secondary information, the information on the GUI, the information on the display device. All of those, it says, could be implemented in a way that you can turn them on or off, or user interaction can turn them on. So it's simply just not true that the specification envisions that it will always automatically have some portion shown after, have a second portion shown after a first portion is shown. Well, I mean, I think their argument is if it's operable, then it's automatic. I mean, it's one thing to say you can turn it on or off, but they're saying that when the primary information source is on and the secondary information source is on, then there will be an automatic response. Well, that's sort of assuming the conclusion. If the primary information source is on, the claim encompasses showing two stories. The first one is on, and is on because maybe the user chose it, for example. And then whether or not the second one is on, that's what the second one is shown in response to the first one. And it's up to the user to choose whether the second one is on or not. And that's what these different parts of the specification are showing. So, for example, the last one that I just read shows that it could be implemented such that user interaction is required to show the second story. And so, as you pointed out, Judge O'Malley, they could have claimed something different. They could have used words other than in response to if they wanted to claim that they were shown at the same time. Well, they could have used automatically in response to, or they could have used coextensive in time, or simultaneously with, or any word that implies that they are automatically shown together in response implies that the content of one is in response to the content of another. So, if I could use an example, if you send me a letter and the mailman delivers it and I send a letter in response, the mailman was required there as an intervening step for me to respond to the letter, but no one would say that I am sending my letter in response to the mailman's delivery of a letter. I am sending a letter in response to your sending me a letter. What do we make of Column 3, Lines 44 to 45? A portion or representation of the related information can be displayed in response to EG simultaneous with. That is certainly one example, and EG means for example. So, for example, it could be simultaneous, but the rest of the specification and the claims make clear that it doesn't have to be simultaneous. So, for example, the portion at Column 14 where it talks about how the second information could be shown only upon appropriate interaction shows that it doesn't have to be shown simultaneously. Well, they are shown simultaneously at the end. I mean, you will never see the second story without also seeing the first story. It's just that you may see the first story without also seeing the second story. Does that make sense? Can I ask, before you get too far down the road and I lose you on time, can we just dispense with any consideration of Footnote 3? Your Honor, it's not Footnote 3 itself. It is that the board, primarily through operation of its rules, is considered to have affirmed the examiner's reasoning. And so an interval has raised the issue of Bender on its own. And so the PTO's consideration of Bender is within the context of the examiner's reasoning about Bender. Well, then why put it in a footnote? We have all these cases to say this court does not consider footnotes. Was it in order to avoid elaboration and just kind of touch on it in case someone was curious? I think it was essentially avoiding elaboration because it had dispensed with all of the claims through the prior rejections. Well, then they should ignore it, right? I wouldn't say you can ignore it because interval has raised it. Well, they had no choice but to cope with what they got from the board. But as far as the board and the office is concerned, it's certainly a curious way of handling a substantive issue. Well, I wouldn't call it the board's handling of the substantive issue. The board simply mentioned it in a footnote and was not intending to analyze Bender, the rejections based on Bender. But because interval has raised it and wants this court to determine the construction of the term portion or representation, the only import of that could be that if this court affirms the construction of portion or representation, the Bender rejections would be affirmed. And if I could turn to Sinead for a few minutes. Interval concedes that Sinead combined with Bender shows all of the limitations of Claim 20 and argues only that they couldn't be combined, particularly because the part of Sinead that's being relied on is about combining an article with a photograph. And Interval says that the photographs don't have signatures. But Sinead itself, at page A130, it says that the supplier adds a signature to each item. And we can tell that Sinead is viewing the photos and the audio as different items from the articles themselves because in the second column on page A130, in the first full paragraph, it says FISHRAP also checks its photo and audio databases to see if there are photos and sound recordings that match the story. So what Sinead is doing is it's storing in its database its photos and its audio and its stories separately. And it has to check its database in order to figure out whether the matching story and matching audio are there. And if they are, it will show them to you. So much like the claimed invention in Interval's patent, it's finding whether these two things are related, whether the story and the photos are related, and if so, showing them to you at the same time. If the Court has no other questions, I'll yield the remainder of my time. Thank you, Ms. Sophie. Mr. Davis. Thank you, Your Honor. Just a few brief comments. The reason that Interval didn't write automatically in response to its claims because it shouldn't have needed to, both the American Calcar case and the Fujitsu case, both used the word automatically when explaining what in response to means. So Interval's position is that it should have been unnecessary to expressly spell out automatically in the independent claims because it's already in there by virtue of the use of the term in response to. Another key point that is alluded to throughout the briefs is the question of what the display must occur in response to. So my friend, when she was up here, she referred to the identification or the selection of the first segment and the identification of the selection of the second segment. What the claim says, though, is it's specific. It says that the generation of the display has to occur in response to the display of the first segment, so not in response to the selection of the display of the content of the first segment, nor does the portion of representation of the second segment simply have its content identified in response to the identification or the display of the first segment. It has to be the generation of a display of the portion of representation of the second segment in response to the display of the first segment. Just a quick note on Bender and the footnote, three, we found ourselves in a difficult position where the Board has alluded to potentially new grounds of rejection, but it didn't adopt it. The Court, of course, is not obligated to reach that issue. The reason we asked is because we expect that if there's a remand, it will be front and center, and we'd rather not go back down to come directly back up for the reasons cited in footnote three of the Board's opinion. And another issue on that front is it is not the case that the only issue with respect to Bender is whether a portion of representation can, in fact, be the entire segment. There are also dependent claims that are directed to navigation techniques selecting the portion of representation of the second segment and generating the full display of the second segment that Bender doesn't disclose because it's a television annotation system that doesn't provide a way for the user to input any selection. So the only issue with respect to Bender, it's not the case that it's only about portion representation. There are also dependent claims that would need to be addressed specifically before any Bender rejections could be affirmed across the Board. Did you specifically address those issues to the Board as it relates to the dependent claims? Yes, Your Honor. The dependent claims directed to navigation with respect to Bender were specifically argued. So I see that my time is up, unless Your Honor has further questions. We'll take the case into revising. Thank you.